RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0066p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
  *Plaintiff-Appellant,*

  *v.*

FORD MOTOR COMPANY,
  *Defendant-Appellee.*

No. 12-2484

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:11-cv-13742—John Corbett O'Meara, District Judge.

Argued: December 3, 2014

Decided and Filed: April 10, 2015

Before:  COLE, Chief Judge; BOGGS, BATCHELDER, MOORE, CLAY, GIBBONS, ROGERS, SUTTON, McKEAGUE, GRIFFIN, KETHLEDGE, WHITE, and STRANCH, Circuit Judges.[*]

_____

**COUNSEL**

**ARGUED:**  Gail S. Coleman, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant.  Helgi C. Walker, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellee.  **ON BRIEF:**  Gail S. Coleman, Lorraine C. Davis, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant.  Helgi C. Walker, Jonathan C. Bond, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., Elizabeth P. Hardy, KIENBAUM OPPERWALL HARDY & PELTON, P.L.C., Birmingham, Michigan, for Appellee.  Ann Elizabeth Reesman, NORRIS, TYSSE, LAMPLEY & LAKIS LLP, Washington, D.C., William S. Consovoy, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Amici Curiae.

---

[*]Judges Cook and Donald have recused themselves in this case.

1

McKEAGUE, J., delivered the opinion of the court in which BOGGS, BATCHELDER, GIBBONS, ROGERS, SUTTON, GRIFFIN, and KETHLEDGE, JJ., joined.  MOORE, J. (pp. 21–43), delivered a separate dissenting opinion in which COLE, C.J., CLAY, WHITE, and STRANCH, JJ., joined.

––––––––––––––––––

**OPINION**

––––––––––––––––––

McKEAGUE, Circuit Judge.  The Americans with Disabilities Act (ADA) requires employers to reasonably accommodate their disabled employees; it does not endow all disabled persons with a job—or job schedule—of their choosing.  Jane Harris, a Ford Motor Company employee with irritable bowel syndrome, sought a job schedule of her choosing: to work from home on an as-needed basis, up to four days per week.  Ford denied her request, deeming regular and predictable on-site attendance essential to Harris's highly interactive job.  Ford's papers and practices—and Harris's three past telecommuting failures—backed up its business judgment.

Nevertheless, the federal Equal Employment Opportunity Commission (EEOC) sued Ford under the ADA.  It alleged that Ford failed to reasonably accommodate Harris by denying her telecommuting request and retaliated against her for bringing the issue to the EEOC's attention.  The district court granted summary judgment to Ford on both claims.  We affirm.

I

The Ford Motor Company employs about 224,000 employees worldwide.  True to its founder's vision, Ford uses its employees in assembly lines to perform independent yet interconnected tasks.  Resale buyers of steel come early on the lines—before any assembling begins.  They purchase raw steel from steel suppliers and then, as their name suggests, resell the steel to parts manufacturers known as "stampers."  The stampers then supply the steel parts to the vehicle assemblers, who put together the vehicles.

As an intermediary between steel and parts suppliers, the resale buyer's job is highly interactive.  Some of the interactions occur by email and telephone.  But many require good, old-fashioned interpersonal skills.  During core business hours, for example, resale buyers meet with suppliers at their sites and with Ford employees and stampers at Ford's site—meetings that Ford

says are most effectively performed face to face. And Ford's practice aligns with its preaching: It requires resale buyers to work in the same building as stampers so they can meet on a moment's notice. This high level of interactivity and teamwork is why, in Ford's judgment, "a resale buyer's regular and predictable attendance in the workplace" is "essential to being a fully functioning member of the resale team." R. 60-2 at ¶ 11.

A former Ford resale buyer with irritable bowel syndrome takes center stage in this case: Jane Harris. Her job performance was, on the whole, subpar. Early on in her six-plus year tenure, she won a few awards, and Ford recognized her for her "strong commodity knowledge" and "diligent[]" work effort. R. 66-2 at 2; R. 60-14 at 6. But over time, the awards and compliments morphed into low ratings and criticisms. Harris placed in the bottom 22% of her peer group in her fourth full year (2007) and in the bottom 10% in her fifth year (2008). It got worse. By her last year (2009), Harris "was not performing the basic functions of her position." R. 60-2 at ¶ 14. Ford said she lacked interpersonal skills, delivered work late, didn't show a concern for quality, and failed to properly communicate with the suppliers. She again ranked in the bottom 10% of her peers.

In addition to performing poorly while at work, she repeatedly missed work entirely. In 2008, she missed an average of 1.5 work days per week; in 2009, she was absent *more* than she was present. And when she didn't miss work, she would often come in late and leave early. As her coworkers and supervisors put it, Harris worked on a "sporadic and unpredictable basis," R. 60-8 at ¶ 4, and had "chronic attendance issues," R. 60-2 at ¶ 8; R. 60-4 at ¶ 3.

Harris's poor performance and high absenteeism harmed those around her. When she missed work, her teammates had to pick up the slack, including by taking on the functions that Harris could not perform at home. Her supervisors also had to assume her job responsibilities. Her absences caused the resale-buyer team "stress and frustration," R. 60-8 at ¶¶ 4–5, further compounded Harris's mistakes, and frustrated suppliers.

Harris's irritable bowel syndrome of course contributed to the situation. It gave her uncontrollable diarrhea and fecal incontinence, sometimes so bad that "it" could "start[] pouring out of [her]" at work. R. 41-4 at 1. She occasionally couldn't even make the one-hour drive to

work without having an accident. The vicious cycle continued, as her symptoms increased her stress, and the increased stress worsened her symptoms—making her less likely to come to work.

Ford tried to help. Harris's first supervisor, Dawn Gontko, for example, adjusted Harris's schedule to help her establish regular and predictable attendance. Most significantly, Gontko allowed Harris two opportunities to "telecommute on an ad hoc basis" in an "Alternative Work Schedule." R. 60-3 at ¶ 3. Under this schedule, Harris worked four 10-hour days (known as flex time) and could telecommute as needed on her work days. Each trial lasted one to two months. But neither succeeded: Despite the *ad hoc* telecommuting and flexible schedules, Harris "was unable to establish regular and consistent work hours" and failed "to perform the core objectives of the job." *Id.*; R. 60-7 at 2.

Ford next tried its "Workplace Guidelines"—a reporting tool specially designed to help employees with attendance issues tied to illnesses. These also failed to improve Harris's attendance or illness. So did the efforts of Harris's next supervisor, John Gordon, which included allowing Harris to telecommute both during and after core business hours. R. 60-2 at ¶ 8. When this third telecommuting attempt failed, the act repeated itself: The new supervisor, like the old, employed the "Workplace Guidelines," and the guidelines again failed to remedy Harris's attendance problems or illness.

Undeterred by these three failed telecommuting attempts, Harris requested leave "to work up to four days per week from home." R. 60-10 at 1. Gontko had told her, after all, that her job would be appropriate for telecommuting. Ford's telecommuting policy generally said the same thing. And several of her coworkers telecommuted. So why couldn't Harris?

Ford's practice and policy limited telecommuting for resale buyers. In practice, Ford's buyers telecommuted, at most, on *one* set day per week. That aligned with its policy, which makes clear that those jobs that require "face-to-face contact"—and those individuals who were not "strong performers" and who had poor time-management skills—were among those not "appropriate for telecommuting." R. 60-11 at 4.

Before making a decision on the request, two of Ford's human-resources representatives and Gordon met with Harris. In the meeting, Gordon went through Harris's ten main job

responsibilities and asked Harris to comment on how she could perform those tasks from home. Of the ten tasks, Harris admitted that she could not perform four of them from home, including meetings with suppliers, making price quotes to stampers, and attending some required internal meetings. Harris added, however, that she did not envision needing to stay home four days per week, only that she wanted the freedom of "*up to* 4 days." R. 66-10 at 3 (emphasis added). Harris's higher-ups told her that they would get back to her about her request.

Ford determined that Harris's proposed accommodation was unreasonable. Management met with Harris to inform her of the decision. Gordon again listed Harris's ten job responsibilities: four that could *not* be performed at home; four that could not *effectively* be performed from home; and two that were "not significant enough to support telecommut[ing]." *Id.* at 4–5. Gordon explained the circumstances under which telecommuting *could* work: on a predictable schedule where the strong-performing employee agrees to come to the worksite as needed even on days set for telecommuting. Harris's coworkers who telecommuted fit that bill. But Harris didn't, and neither did her proposed schedule.

Even though Ford did not grant her requested telecommuting schedule, management told Harris that they could accommodate her in other ways, such as moving her closer to the restroom or looking for jobs better suited for telecommuting. Harris turned down each alternative accommodation. The second meeting ended as Ford informed Harris that it would "talk with her again if she identifie[d] another accommodation." R. 66-10 at 6. Harris never did. Rather, she sent an email one week later claiming that the denial of her request violated the ADA. And she filed a charge of discrimination with the EEOC a day after that.

The rest of Harris's time at Ford did not go well. She felt threatened by Gordon in their weekly meetings scheduled to improve her attendance and performance. And in July of 2009, she ranked in the bottom 10% of her peers for the second evaluation in a row. She disputed the evaluation, claiming that it represented retaliation by Ford for her filing of the discrimination charge. Though asked to elaborate, Harris never did. She instead began a Performance Enhancement Plan. Designed so that the tasks could be "easily" completed within a 30-day deadline, R. 60-15 at ¶ 6, Harris had to complete a one-page spreadsheet, resolve "material claims," develop a plan to complete work that had been outstanding since the previous year, and

the like.  R. 60-2 at ¶¶ 20–22.  Harris did not satisfy the requirements of the Plan, failing to complete the tasks either entirely or on time.  After several years of subpar performance and high absences, this was apparently the last straw: Mike Kane (the Senior Purchasing Manager for Raw Materials) and Lisa King (his manager) decided to terminate Harris on September 10, 2009.

Almost two years later, on August 25, 2011, the EEOC sued Ford under the ADA.  It alleged that Ford failed to reasonably accommodate Harris's disability (violating 42 U.S.C. § 12112(a), (b)(5)(A)), and that it discharged her in retaliation for filing her charge (violating 42 U.S.C. § 12203(a)).  On June 29, 2012, Ford moved for summary judgment.

The district court granted Ford's motion on September 10, 2012.  It concluded that "working from home up to four days per week is not [a] reasonable" accommodation under the ADA and that "the evidence [did] not cast doubt on Ford's stated reason for terminating Harris's employment: poor performance."  *EEOC v. Ford Motor Co.*, No. 11-13742, 2012 WL 3945540, at *7–*8 (E.D. Mich. Sept. 10, 2012).  The EEOC appealed, and a divided panel of this court reversed on both claims.  *EEOC v. Ford Motor Co.*, 752 F.3d 634 (6th Cir. 2014).

We granted en banc review, thereby vacating the panel's decision.  Giving fresh review to the district court's summary-judgment decision and drawing reasonable inferences in the EEOC's favor, we must determine whether there exists a "genuine dispute as to any material fact" on either issue: failure to accommodate or retaliation.  Fed. Rule Civ. Proc. 56(a).  At the summary-judgment stage, we view the facts "in the light most favorable to the nonmoving party" (usually by adopting the plaintiff's version of the facts) "*only if* there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added).  A "genuine" dispute exists when the plaintiff presents "significant probative evidence" "on which a reasonable jury could return a verdict for her."  *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Determining whether a genuine dispute exists of course requires a "fact-intensive, case-by-case" analysis.  Dissent Op. at 21, 28, 42.  But it equally requires looking to case law for guidance and addressing *all* the facts in the record—including those that uniformly cut against the plaintiff.  Undertaking this analysis, we hold that there is no genuine dispute of material fact on this record: A reasonable jury could not return a verdict for the EEOC on either claim.

II

Many disabled individuals require accommodations to perform their jobs. The ADA addresses this reality by requiring companies like Ford to make "reasonable accommodations to the known . . . limitations of an otherwise qualified individual with a disability" where such an accommodation does not cause the employer "undue hardship." 42 U.S.C. § 12112(b)(5). To comply with the ADA, then, Ford must "reasonabl[y] accommodat[e]" Harris (undisputedly a disabled individual for purposes of this appeal) if she is "*qualified*." §§ 12112(a), (b)(5) (emphasis added); *see Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997).

To be "qualified" under the ADA, Harris must be able to "perform the essential functions of [a resale buyer]" "with or without reasonable accommodation." 42 U.S.C. § 12111(8). A "reasonable accommodation" may include "job restructuring [and] part-time or modified work schedules." *Id.* at § 12111(9)(B). But it does *not* include removing an "essential function[]" from the position, for that is *per se* unreasonable. *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998); *see Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987). The district court held that Harris was *not* qualified because her excessive absences prevented her from performing the essential functions of a resale buyer. We agree.

A

Is regular and predictable on-site job attendance an essential function (and a prerequisite to perform other essential functions) of Harris's resale-buyer job? We hold that it is.

1

We do not write on a clean slate. Much ink has been spilled establishing a general rule that, with few exceptions, "an employee who does not come to work cannot perform any of his job functions, essential or otherwise." *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948 (7th Cir. 2001) (en banc) (quoting *Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir. 1994) (internal quotation marks omitted)). We will save the reader a skim by omitting a long string-cite of opinions that agree, but they do. *E.g.*, *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237–38 (9th Cir. 2012) (collecting cases); *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122–24 (10th Cir. 2004) (same). Our Circuit has not bucked the trend. *E.g.*,

*Ameritech*, 129 F.3d at 867.  And for good reason: "most jobs require the kind of teamwork, personal interaction, and supervision that simply cannot be had in a home office situation." *Rauen v. U.S. Tobacco Mfg. L.P.*, 319 F.3d 891, 896 (7th Cir. 2003).

That general rule—that regularly attending work on-site is essential to most jobs, especially the interactive ones—aligns with the text of the ADA.  Essential functions generally are those that the employer's "judgment" and "written [job] description" prior to litigation deem essential.  *See* 42 U.S.C. § 12111(8).  And in most jobs, especially those involving teamwork and a high level of interaction, the employer will require regular and predictable on-site attendance from all employees (as evidenced by its words, policies, and practices).

The same goes for the EEOC's regulations.  They define essential functions as those that are "fundamental" (as opposed to "marginal"), 29 C.F.R. § 1630.2(n)(1), so that a job is "fundamentally alter[ed]" if an essential function is removed.  29 C.F.R. § Pt. 1630(n), App. at 394.  To guide the essential-function inquiry, the regulations speak in factors—seven of them. The first two restate the statutory considerations.  29 C.F.R. § 1630.2(n)(3)(i)–(ii).   The remaining five add other considerations.  29 C.F.R. § 1630.2(n)(3)(iii)–(vii).  In many jobs, especially the interactive ones, all seven point toward finding regular and predictable on-site attendance essential.   Take the amount of time performing that function, for example, § 1630.2(n)(3)(iii): Most of one's *work* time is spent *at work*, and many interactive functions simply cannot be performed off site.  Or take the consequences of failing to show up for work, § 1630.2(n)(3)(iv): They can be severe.  *See* Equal Employment Advisory Council Supp. Br. 9. Ditto for the terms of the collective bargaining agreement, § 1630.2(n)(3)(v): They certainly won't typically exempt regular attendance.  Other employees' work practices are no different, § 1630.2(n)(3)(vi)–(vii): Other employees usually attend work at the worksite.  And so on, such that most jobs would be *fundamentally altered* if regular and predictable on-site attendance is removed.

The EEOC's informal guidance on the matter cuts in the same direction.  An employer may refuse a telecommuting request when, among other things, the job requires "face-to-face interaction and coordination of work with other employees," "in-person interaction with outside colleagues, clients, or customers," and "immediate access to documents or other

information located only in the workplace." EEOC Fact Sheet, *Work At Home/Telework as a Reasonable Accommodation* (Oct. 27, 2005), http://www.eeoc.gov/facts/telework.html; *cf.* EEOC, *Employer Best Practices for Workers with Caregiving Responsibilities*, http://www.eeoc.gov/policy/docs/caregiver-best-practices.html (Jan. 19, 2011) (explaining that "impromptu team meetings" are a valid factor for denying an employee the privilege to work in a flexible work schedule). That is because, as the EEOC elsewhere explains, "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards." 29 C.F.R. § Pt. 1630(n), App. at 395. Nor is it meant "to require employers to lower such standards." *Id.* But that's what would happen in many jobs if regular, in-person attendance was not required.

A sometimes-forgotten guide likewise supports the general rule: common sense. *Waggoner v. Olin Corp.*, 169 F.3d 481, 482–84 (7th Cir. 1999). Non-lawyers would readily understand that regular on-site attendance is required for interactive jobs. Perhaps they would view it as "the basic, most fundamental" "activity" of their job. Webster's Third New International Dictionary 777, 920 (1986) (defining "essential" and "function"). But equipped with a 1400-or-so page record, standards of review, burdens of proof, and a seven-factor balancing test, the answer may seem more difficult. Better to follow the commonsense notion that non-judges (and, to be fair to judges, our sister circuits) hold: Regular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs, especially the interactive ones. That's the same rule that case law from around the country, the statute's language, its regulations, and the EEOC's guidance all point toward. And it's the controlling one here.

2

That rule has straightforward application here: Regular and predictable on-site attendance was essential for Harris's position, and Harris's repeated absences made her unable to perform the essential functions of a resale buyer. The required teamwork, meetings with suppliers and stampers, and on-site "availability to participate in . . . face-to-face interactions," R. 60-2 at ¶ 11, all necessitate a resale buyer's regular and predictable attendance. For years Ford has required resale buyers to work in the same building as stampers, further evidencing its judgment that on-

site attendance is essential. And the practice has been consistent with the policy: all other resale buyers regularly and predictably attend work on site. Indeed, even those who telecommute do so only one set day per week and agree in advance to come into work if needed. Sealing the deal are Harris's experiences and admissions. Her excessive absences caused her to make mistakes and caused strife in those around her. And she agreed that four of her ten primary duties could not be performed from home. R. 66-10 at 2. On this record, the EEOC cannot show that regularly attending work was merely incidental to Harris's job; it was *essential* to her job.

It follows that Harris's up-to-four-days telecommuting proposal—which removed that essential function of her job—was unreasonable. *Brickers*, 145 F.3d at 850; *Mason*, 357 F.3d at 1124. The *employee* bears the burden of proposing an accommodation that will permit her to effectively perform the essential functions of her job. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010); *accord* Dissent Op. at 33. Harris proposed only one accommodation— one that would exempt her regular and predictable attendance from her resale-buyer job. In failure-to-accommodate claims where the employee requests an "accommodation that *exempts* her from an essential function," "the essential functions and reasonable accommodation analyses [] run together." *Samper*, 675 F.3d at 1240. One conclusion (the function is essential) leads to the other (the accommodation is not reasonable). That's this case. Harris's proposed accommodation was unreasonable.

Nor could Harris perform the essential functions of her job with Ford's past reasonable accommodations. Three times Ford allowed Harris to telecommute on an as-needed basis (on flex time, no less). And three times Ford developed plans to improve her attendance. But all six efforts failed because Harris proved unable "to establish regular and consistent work hours" or "perform the core objectives of the job." R. 60-3 at ¶ 3. The ADA does not give her a seventh try. Harris is not a "qualified individual" as a matter of law. 42 U.S.C. § 12111(8).

B

The EEOC sees it differently. It argues that three sources—(1) Harris's own testimony, (2) other resale buyers' telecommuting practices, and (3) technology—create a genuine dispute of fact as to whether regular on-site attendance is essential. But none does.

(1) *Harris's testimony.* An employee's unsupported testimony that she could perform her job functions from home does not preclude summary judgment, for it does not create a *genuine* dispute of fact. Neither the statute nor regulations nor EEOC guidance instructs courts to credit the employee's opinion about what functions are essential. That's because we do not "allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience." *Mason*, 357 F.3d at 1122. And for good reason: If we did, every failure-to-accommodate claim involving essential functions would go to trial because all employees who *request* their employer to exempt an essential function *think* they can work without that essential function.

In any event, Harris's testimony does not add much. Harris testified that she used conference-call capabilities to perform a "vast majority" of her otherwise face-to-face interactions. R. 66-3 at ¶¶ 3–8. But she does *not* say that she could perform the vast majority of her work *as effectively* off-site, and the essential-job-function inquiry does not require employers to lower their standards by altering a job's essential functions. *See* 29 C.F.R. § Pt. 1630, App. at 395–96 (portion titled "Section 1630.2(n) Essential Functions"). Harris's testimony thus does not contradict the uniform record evidence that a resale buyer could not work from home on an unpredictable basis without lowering production standards. *See id.* Nor does Harris say that she could perform *all* of her duties from home; she indeed admits that four of her ten main duties had to be done at the worksite. R. 66-10 at 2. And Harris's past failed telecommuting experiences put to rest any doubts as to whether she could effectively work from home—she couldn't. R. 60-3 at ¶ 3; R. 60-7 at 2. The EEOC needs more to reach a jury.

(2) *Other employees' telecommuting schedules.* The evidence of other buyers' schedules likewise doesn't do the trick. Unlike an employee's own testimony, though, this consideration has support in the regulations, 29 C.F.R. § 1630.2(n)(3)(vii), and in our case law, *Rorrer v. City of Stow*, 743 F.3d 1025, 1042 (6th Cir. 2014). And unlike an employee's own testimony, it makes sense to look at this kind of evidence: It reflects the *employer's* judgment—which is not just what the employer *says* but also what the employer *does*. Picking up on this, the EEOC argues that because Ford allowed several other resale buyers to telecommute, working from the worksite must not have been essential.

On this record, we disagree. This argument might work if the other employees' schedules were materially similar (say, unpredictably telecommuting three days per week). But Harris's coworkers worked from home on materially *different* schedules: on one set day per week—no more, and sometimes less. The most any employee was even *authorized* to work from home was two days per week, and that employee actually telecommuted only one day per week. And critically, every telecommuter agreed in advance to come into work on their set telecommuting day if needed at the worksite. That's a far cry from Harris, who: (i) requested up to *four* days per week; (ii) would not schedule the days in advance; and (iii) refused to come on-site if needed. None of these other employees' more predictable and more limited schedules removed regular on-site attendance from the resale buyer's job. They thus do not create a genuine issue of fact.

In addition to being legally and factually unsupported, the EEOC's view here would cause practical harm to private employers. The ADA encourages—indeed, requires—employers to make reasonable accommodations for its employees, including allowing telecommuting under the proper circumstances. 42 U.S.C. § 12111(9)(B). But if the EEOC's position carries the day, once an employer allows *one* person the ability to telecommute on a *limited* basis, it must allow *all* people with a disability the right to telecommute on an *unpredictable* basis up to 80% of the week (or else face trial). That's 180-degrees backward. It encourages—indeed, requires—employers to *shut down* predictable and limited telecommuting as an accommodation for *any* employee. A "good deed would effectively ratchet up liability," which "would undermine Congress' stated purpose of eradicating discrimination against disabled persons." *Ameritech*, 129 F.3d at 868 (citation omitted). The practical effect? Companies would tighten telecommuting policies to avoid liability, and countless employees who benefit from currently generous telecommuting policies would suffer. A protective tool becomes a weapon if used unwisely; and telecommuting should not become a weapon.

(3) *Technology*. Despite its commonsense charm, the EEOC's appeal to technology ultimately fails to create a genuine fact issue. It is "self-evident," the EEOC declares without citation to the record or any case law, that "technology has advanced" enough for employees to perform "at least some essential job functions" at home. Reply Br. 4; *accord* Dissent Op. at 29.

In the abstract, no doubt, this is precisely right. *E.g.*, *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995) (recognizing as much). But technology changing *in the abstract* is not technology changing *on this record*. Our review of a district court's summary-judgment ruling is confined to the record. And no record evidence—*none*—shows that a great technological shift has made this highly interactive job one that can be effectively performed at home. The proper case to credit advances in technology is one where the record *evinces* that advancement. There is no such evidence here.

In fact, the evidence here shows the opposite: technology has *not* changed so as to make regular in-person attendance marginal for this job. Ford uses "fairly limited" video conferencing and "tend[s] more towards audio conferencing." R. 60-5 at 44–48. Harris also testified that she used email and her computer. These technologies—email, computers, telephone, and limited video conferencing—were equally available when courts around the country uniformly held that on-site attendance is essential for interactive jobs. The extra-record changes in technology, like Harris's testimony and her coworkers' practice before it, therefore do not create a genuine issue of fact as to the essential nature of regularly and predictably attending work on-site. Summary judgment remains proper.

One more point, for clarification. None of this is to say that whatever the employer says is essential necessarily becomes essential. *Contra* Dissent Op. at 25; 27–28. Suppose, for instance, that a fire department regularly allows certain firefighters to refrain from driving fire trucks. But then the department denies the same accommodation to a firefighter with a known disability that prevents her from driving the trucks. A genuine fact issue might exist as to whether driving a fire truck is *actually* essential—it is contradicted by materially similar job practices. *Cf. Rorrer*, 743 F.3d at 1042; *see also Solomon v. Vilsack*, 763 F.3d 1, 12 (D.C. Cir. 2014). Our ruling does not, in other words, require blind deference to the employer's stated judgment. But it *does* require granting summary judgment where an employer's judgment as to essential job functions—evidenced by the employer's words, policies, and practices and taking into account all relevant factors—is "job-related, uniformly-enforced, and consistent with business necessity." *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001). That

aptly describes Ford's judgment regarding regular and predictable on-site attendance for resale buyers. The district court accordingly properly granted summary judgment.

C

Our conclusion that Harris was unqualified for her position makes it unnecessary to consider whether Ford showed bad faith in the discussions to work out a reasonable accommodation while Harris was still employed. Even if Ford did not put sufficient effort into the "interactive process" of finding an accommodation, 29 C.F.R. § 1630.2(o)(3), "that failure is actionable only if it prevents identification of an appropriate accommodation *for a qualified individual.*" *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013) (emphasis added); *see Mason*, 357 F.3d at 1124 n.4. Courts thus need not consider this form of non-independent liability "if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." *Basden*, 714 F.3d at 1039. It suffices here to hold that any failure by Ford does not create liability because, as we just concluded, the EEOC did not produce such evidence.

But one more word on this: The record, in any event, uniformly shows that Ford *did* act in good faith "to initiate"—and maintain—"an informal, interactive process" with Harris. 29 C.F.R. § 1630.2(o)(3). It met with Harris to engage in an "interactive discussion, dialogue[,] and opportunity to review various options that would meet both the needs of the business as well as [Harris's] personal needs." R. 66-10 at 2. It sought clarification on Harris's telecommuting request (to which Harris reiterated that she was asking for the unpredictable "up to [four] days per week"). *Id.* at 3. It twice met with Harris and identified two alternative accommodations—moving Harris closer to the restroom and changing Harris to a position with more telecommuting opportunities—even though it was not legally required to counteroffer, *Jakubowski*, 627 F.3d at 202–03. *Contra* Dissent Op. at 26–27, 32–36. And even after Harris rejected both counteroffers, Ford persisted that it was willing to "talk with [Harris] again if she identifie[d] another accommodation" because Ford wanted "her to remain in the workplace." R. 66-10 at 6. It was Harris's turn to propose a reasonable accommodation to Ford, and she never did. Having failed to do so, she doesn't get the chance to try again before a jury.

***

To sum up, the EEOC must prove that Harris is a "qualified individual," which means she can perform the essential functions of a resale buyer with a reasonable accommodation. The record shows that Harris cannot regularly and predictably attend the workplace—an essential function, and a prerequisite to other essential functions—even with the past reasonable accommodations of telecommuting trials and specialized plans to improve her attendance. And Harris's proposed unpredictable, *ad hoc* telecommuting schedule was not reasonable because it would have removed at least one essential function from her job. Harris is unqualified as a matter of law, and the district court correctly granted summary judgment on this claim.

III

That conclusion goes some way to answering the next question: Did Ford retaliate against Harris for making a charge of discrimination? We hold that it did not.

The ADA separately prohibits companies like Ford from "discriminat[ing] against any individual because such individual has . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a). Discrimination here means retaliation—that "but for" an employee's statutorily protected activity the employer would not have taken the "adverse employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533, 2535 (2013); *see Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318–19 (6th Cir. 2012) (en banc). To assess these claims, we use the familiar *McDonnell-Douglas* burden-shifting framework. *See Penny v. United Parcel Servs.*, 128 F.3d 408, 417 (6th Cir. 1997). The plaintiff "must first establish, by a preponderance of the evidence, [her] 'prima facie' case." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). If the plaintiff does so, the defendant has a burden of *production* to articulate a nondiscriminatory reason for its action. *Id.* at 507. If the defendant meets its burden, the plaintiff must prove the given reason is pretext for retaliation. *Id.* at 515.

Assume for now that the EEOC has met its prima facie case (but more on this later). The burden shifts to Ford, which has met it by producing evidence that it fired Harris because she was a poor performer. It offered undisputed evidence of back-to-back-to-back poor performance reviews, Harris's lacking interpersonal skills, and Harris's many absences, which in turn caused

mistakes.  And it offered evidence that Harris failed three specialized attendance plans before it terminated her.  The burden shifts back to the EEOC to show pretext to prevail on its retaliation claim.

To demonstrate pretext, a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful.  *Hicks*, 509 U.S. at 515; *see Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000).  To avoid summary judgment, then, the EEOC must present evidence from which a reasonable jury could find that poor performance was not the real reason that Ford terminated Harris, and that unlawful retaliation in fact was.

It trips over the first hurdle: No reasonable jury could find that Ford terminated Harris for a reason other than poor performance.  Harris's performance and interpersonal issues have been well documented.  The EEOC indeed admits they existed.  Suffice it here to say that, among other problems, Harris failed to update spreadsheets, complete her paperwork, schedule her training sessions, price items correctly, and finish her work on time.  Her performance issues are why she ranked in the bottom 10% of her peer group *before* she made her charge.

The EEOC offers other evidence that, in its view, shows that Ford fired Harris because she filed a charge with the EEOC, not because of these performance issues.  Timing is on the EEOC's side: The mere four months between Harris's charge and her discharge seems suspicious.  But while this "gives us pause," "temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012).  So the EEOC needs more to reach a jury.  It relies on three facts or inferences to create a genuine issue of material fact: (1) the meetings between Harris and her supervisor Gordon where Harris felt threatened; (2) the post-charge negative performance review; and (3) the alleged design of the post-charge performance-enhancing plan.  Even when coupled with the timing, none suffices.

(1) *Harris–Gordon Meetings*.  The meetings between Harris and Gordon do not create a genuine fact issue.  To start, we doubt a reasonable jury could view these meetings—which Ford says were meant to *help* Harris, a worker with a long history of attendance and performance problems—as meant to *hurt* her.  We "look at the facts as they appear to the person making the decision to terminate [the employee]," not at "the employee's subjective [beliefs]." *Kendrick v.*

*Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000). Harris's unexpressed "subjective skepticism regarding the truth of" whether Gordon was actually trying to help her does not alone "raise a triable issue as to pretext." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992)). Plus, these kinds of meetings do "not constitute harassment simply because they cause the employee distress." *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998).

But putting that aside, an even more fundamental point resolves this issue: The meetings involved only Gordon, a *non*decisionmaker. Actions by nondecisionmakers cannot alone prove pretext. *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998). Neither can decisionmakers' statements or actions outside of the decisionmaking process. *Id.*; *see Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004). Both principles apply to Gordon. When Ford decided to terminate Harris, Gordon was *on vacation*. R. 60-2 at ¶ 26. And critically (and undisputedly), no one at Ford consulted with him or received a recommendation from him before making its termination decision. *Id.*; R. 60-15 at ¶ 8. So by definition, Gordon was a nondecisionmaker outside of this decisionmaking process. As Harris's direct supervisor, he of course had an *effect* on her termination: He oversaw her overall poor performance and reported her failures during the performance-enhancing plan to his supervisors. *See* R. 66-23 at 26–28; R. 60-5 at 67–68. But we do not define "decisionmaker" at such a high level of generality. The record uniformly shows that Gordon had no direct relation to the actual termination decision, and thus his allegedly harassing conduct cannot be imputed to Ford.

Nor can Gordon's conduct in these meetings be imputed to Ford through the so-called "cat's paw" theory. That theory would hold Ford liable if Gordon, motivated by retaliatory animus, intended to cause Harris's termination and proximately caused the actual decisionmakers to terminate her. *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011). In its five appellate briefs and in its brief below, the EEOC never so much as hinted that this theory might apply, which doubly forfeited the argument. *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) ("[C]onclusory allegations and perfunctory statements, unaccompanied by citations or some effort at legal argument, do not meet th[e] standard" for raising an argument on appeal.); *Estate of Quirk v. Comm'r*, 928 F.2d 751, 757–58 (6th Cir. 1991) ("It is well-settled

that, absent exceptional circumstances, a court of appeals will not consider an argument by an appellant that was not presented to or considered by the trial court."). That was a wise move by the EEOC, for, among other reasons, no evidence shows a "direct relation between the injury asserted [termination] and the injurious conduct alleged [Gordon's intimidation]." *Staub*, 131 S. Ct. at 1192; *see Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 836–37 (6th Cir. 2012). The dissent would nevertheless apply this theory. Dissent Op. at 41–42. But that contravenes the rule that the *parties* (not judges) raise the arguments. And it expands this theory—fattens the cat, so to speak—far too much. This argument was forfeited, and, in any event, Gordon was no monkey, and Ford, not his cat. *Staub*, 131 S. Ct. at 1190 n.1.

(2) *Performance Review*. The 2009 post-charge negative performance review fares no better. At first glance, this looks bad for Ford. Harris received her first "lower achiever" rating post-charge, and she received only "excellent plus" ratings before her charge. The EEOC stops there. But digging deeper—and looking at the *whole* record—reveals two reasons why no reasonable jury could find this low rating proof of pretext. For one, 2009 was the only year that Harris *could have* received the lower-achiever rating. Ford overhauled its ratings system that year for all employees, ditching the default "excellent plus" category (which 80% of workers received) in favor of a more accurate description of a worker's performance. In Harris's case, that meant "lower achiever"—the first and only time she could receive that rating. For two, the change in name did not change Harris's low numerical ranking. In her only performance review *after* the charge, she ranked in the same percentile range as she did immediately *before* the charge: the bottom 10%. That's not evidence of retaliation; that's just poor performance—both before and after the charge.

(3) *Performance-Enhancing Plan*. Harris's testimony that Ford designed the post-charge performance-enhancing plan to ensure her failure does not create a genuine dispute either. Any negative inference from this testimony is unreasonable because it comes unaccompanied by facts in the record, save Harris's own speculation. And we do not accept the plaintiff's speculation where, as here, it does not create a "genuine" dispute of fact—that is, when it is "blatantly contradicted by the record." *Scott*, 550 U.S. at 380. The record shows that Harris failed *two* prior plans to improve her performance and attendance, similar to this one—and both *before* she

filed her charge. The record also shows that Harris failed to achieve *any* of the objectives identified in post-charge plan, R. 60-2 at ¶¶ 22–25—not just the objective the EEOC says is evidence of retaliation (eliminating her backlog of paperwork, *see* Dissent Op. at 38–39.). And the record shows that Ford used similar performance-enhancing plans for other employees who, like Harris, performed poorly. *See, e.g.*, R. 60-4 at ¶ 17; R. 60-15 at ¶ 5. Harris's testimony thus fails to create a genuine dispute of fact because it is "so utterly discredited by the record that no reasonable jury" could believe it. *Scott*, 550 U.S. at 380.

The EEOC has failed to present evidence from which a reasonable jury could find that the real reason Ford terminated Harris was unlawful retaliation and not poor performance. Ford is entitled to judgment as a matter of law because the EEOC created at most "a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148. Lacking evidence that creates a genuine dispute of fact, the EEOC's retaliation claim fails as a matter of law. The district court correctly granted summary judgment in Ford's favor.

Now briefly back to the EEOC's prima facie case, for it provides an alternate ground on which to grant summary judgment: The EEOC cannot establish but-for causation. To prevail on a retaliation claim, a plaintiff must "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 133 S.Ct. at 2534. Here that means that the EEOC must present evidence from which a reasonable jury could find that Ford would not have fired Harris if she had not made her charge.

For many of the same reasons discussed above, no reasonable jury could have found such causation here. In addition to Harris's past failings, she admitted that she would not be able to attend work on-site in a regular and predictable manner in the future. And this attendance was an essential element of her job. No reasonable jury could find that Ford—a for-profit corporation— would continue to pay an employee who failed to do her job well in the past, and who, by her own admission, could not perform the essential elements of her job in the future. The EEOC thus cannot demonstrate that Harris's charge was the but-for cause of Ford's decision to fire her, which means that Ford was entitled to summary judgment for that reason as well.

IV

Nearly thirty years later, it's worth repeating: To overcome a well-supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The EEOC has not done so here.  We affirm.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.  This case concerns one person, Jane Harris, her job as a resale buyer at one Ford work-site, and the particularly difficult challenges she faces as a result of her medical condition of irritable bowel syndrome ("IBS"). She argues that Ford failed reasonably to accommodate her disability when it refused her request to telework some days each week.  At this moment, this case is not even about whether Harris should prevail against Ford.  The question is simply whether she has presented enough evidence to create a genuine dispute of material fact such that summary judgment for Ford is not proper.

The key issue is whether Harris is a qualified individual to bring a discrimination claim under the ADA.  42 U.S.C. § 12111(8); *id.* § 12112(a).  In this case, this requires showing that either physical presence at the work-site is not an essential function of Harris's job as a resale buyer, or relatedly, that telework is a reasonable accommodation for Harris.  The ADA and the EEOC regulations implementing the statute provide courts with a non-exhaustive list of seven factors to help guide our consideration of these issues.  29 C.F.R. § 1630.2(n)(3).  But the overarching focus of those regulations is that "[w]hether a particular function is essential is a factual determination that must be made on a case by case basis."  29 C.F.R. § 1630, app. § 1630.2(n).  And because this case is an appeal from a grant of summary judgment, this intensive factual determination must be undertaken while "view[ing] all evidence in the light most favorable" to Harris.  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

I dissent because the majority refuses to engage in the fact-intensive, case-by-case determination required by the EEOC regulations and repeatedly refuses to take the facts in the light most favorable to Harris, as summary judgment requires.  When we apply both standards properly, the EEOC has presented sufficient evidence to dispute whether Harris is a qualified individual, either because physical presence is not an essential function of her job or because telework is a reasonable accommodation for her.  There is also a genuine dispute about whether Ford retaliated against Harris for filing a charge with the EEOC.

## I. ANALYSIS

**A.    Harris's request to telework**

It is crucial to begin with what Harris actually requested.  Harris first requested telework in an email to HR, stating that "[p]er my disability and Ford's Telecommuting policy, I am asking Ford to Accommodate my disability by allowing me to work up to four days per week from home."  R. 60-10 (Harris Email to Pray) (Page ID #1100).  A comparison to Ford's telecommuting policy makes clear that Harris's initial request drew directly from the language of that policy, which allowed for "one to four days" of telework each week.  R. 60-11 (Telecommuting Policy at 2) (Page ID #1103) ("[A]n employee may work *one to four days* from the Telecommuting/alternate work site." (emphasis added)).  Ford met with Harris two times to discuss her request, on April 6 and April 15, 2009.  R. 66-10 (Mtg. Notes) (Page ID #1318– 1324).  In the first meeting on April 6, Harris explicitly told Ford that her request was based on the policy language and that she was not asking to telework four days per week, every week.  R. 66-10 (Mtg. Notes at 3) (Page ID #1320) ("[Harris] said she is not envisioning that she would need to telecommute 4 days per week.  When she was talking about it previously, she was just stating what the policy allowed for—up to 4 days per week.").  Ford began the second meeting on April 15 by telling Harris that she could not telecommute.  R. 66-10 (Mtg. Notes at 4) (Page ID #1321).  Therefore, as discussed more fully below, Ford cut off Harris's request without attempting to clarify the specific details of what she was seeking.

The key point is that Harris proposed to be out of the office *up to* four days each week, not four days per week, every week.  The relevant questions in this case are therefore whether physical presence every day of the week is an essential function of Harris's job, and whether telework some days each week is a reasonable accommodation.

**B.    The EEOC created a genuine dispute of material fact whether physical presence at the work-site is an essential function of Harris's job.**

I agree that we should consider Ford's judgment that physical presence in the office is an essential function of Harris's job.  However, Ford gave *only one reason* for why physical presence is an essential function—that the resale buyer position requires a great deal of face-to-face teamwork.  Ford did not and could not argue that Harris needed to be in the office to use key

equipment or to provide services to outside clients, for example. What exactly is the teamwork that Ford claims must be performed face-to-face? Based on the limited record of this case, it appears to be two things: (1) spur-of-the-moment meetings to address unexpected problems in the supply chain, and (2) scheduled meetings. Appellee Supp. En Banc Br. at 9–10.

In contrast, the EEOC presented two pieces of evidence that directly contradict Ford's claim that the teamwork functions of Harris's job required her to be physically present in the office. First, Harris attested in her declaration that she actually performed 95% of her job on the phone or through email, *even when in the office*. Second, Ford allowed other resale buyers to telework. This suggests that, to perform effectively, resale buyers do not need to be prepared to handle unexpected problems in the supply chain through face-to-face interactions every day of the week.

A reasonable jury might ultimately agree with Ford, or it might agree with Harris. The point is that there is a genuine dispute of material fact that *only* a jury should resolve.

## 1. Harris's declaration

Harris's sworn declaration directly contradicts Ford's insistence that the teamwork required of resale buyers—both spur of the moment trouble-shooting and scheduled meetings—is actually done face-to-face. Harris attested that she performed 95% of her job duties electronically (on the computer or telephone), even when in the office. R. 66-3 (Harris Decl. ¶ 10) (Page ID #1263) ("Approximately 70% percent [sic] of the work I did as a Buyer was done on a computer. Approximately 25% of the work I did as a Buyer was done on the telephone."). Harris added that "the vast majority of communications and interactions with both the internal and external stakeholders were done via a conference call." *Id.* ¶ 3 (Page ID #1262). She further declared that she "frequently communicated with [her] co-workers via email even though both [she] and [her] co-workers were in the office," and that she "also frequently communicated with suppliers via email and telephone." *Id.* ¶¶ 5–6 (Page ID #1263). Harris attested that scheduled teamwork, like meetings, did not always occur face-to-face. She stated that Ford had "telephone conference call capabilities which would allow employees to engage in a meeting without actually having all the meeting stakeholders present in the same room," and

that "*all* internal meetings included the conference call attendance option." *Id.* ¶¶ 7, 9 (Page ID #1263) (emphasis added).

The majority dismisses Harris's testimony because she does not say she could perform all of her duties "*as effectively* off-site." Maj. Op. at 13. But that focus certainly is not taking the evidence in the light most favorable to Harris, as the summary-judgment standard commands. Instead, the majority is actively looking for ways to read omissions—not even actual statements—in her testimony in the light *least* favorable to her.

Although Harris agreed when she first met with her supervisor that four of her ten to eleven job responsibilities could be done only at Ford, a closer look at the record reveals that she disputed that the tasks arose every day or that they could not be postponed until she was next in the office, which would be at least some days each week. R. 66-10 (Mtg. Notes at 2) (Page ID #1319).[1] At least one of those four responsibilities—supplier site visits—does not advance Ford's argument that physical attendance *at the Ford work site* is an essential function of Harris's job because Harris would have to travel to make those visits; whether she leaves from the office or from home should not matter.[2] Nor is there any indication in the record whether all four tasks are themselves properly considered essential functions of the resale buyer job. For example, we do not know "[t]he amount of time spent on the job performing [these] functions," one factor mentioned in the EEOC regulations. 29 C.F.R. § 1630.2(n)(3)(iii).

We can consider Harris's own experience on the job. The EEOC regulations make explicit that we can consider relevant evidence to define the essential functions of a job, even if the evidence is not explicitly articulated in the regulations. 29 C.F.R. § 1630.2(n)(3) (stating that

---

[1]Ford's meeting notes are not even consistent as to how many of Harris's job responsibilities could in no way be performed remotely. In its second meeting with Harris on April 15, 2009, Ford's meeting notes list only three of Harris's ten job responsibilities as ones that "could not be conducted from home" or "could not have been done remotely." R. 66-10 (Mtg. Notes at 4–5) (Page ID #1321–22). Three tasks are labeled as ones that "[c]an be done from home" or remotely. *Id.* For Harris's remaining job responsibilities, Ford falls back on its contention that the tasks are "often done face to face" or require "a high level of interaction" with other parties. *Id.* at 4–5 (Page ID #1321–22).

[2]Ford did not present any evidence suggesting Harris would be unable or less able to make site visits if she telecommuted for some period of time each week. In contrast, the EEOC *did* present evidence suggesting that allowing Harris to telework would likely increase her ability to make such visits reliably in the future. Harris's doctor wrote that her IBS outbreaks would likely become progressively fewer and less frequent the longer Ford allowed her to telework: "If she were allowed to work from home/telecommute when her IBS was bad . . . [h]er work productivity and her health would both improve." R. 41-5 (Ladd Ltr.) (Page ID #631). A second doctor testified in his deposition that "there was [sic] times like up to a year" when Harris was without IBS symptoms "because she wasn't stressed." R. 64-7 (Donat Dep. at 16) (Page ID #1211).

"[e]vidence of whether a particular function is essential includes, *but is not limited to*" the seven listed factors) (emphasis added); *see also* 29 C.F.R. § 1630, app. § 1630.2(n) ("[T]he list [of factors included in § 1630.2(n)(3)] is *not exhaustive*.") (emphasis added). The appendix continues that "other relevant evidence may also be presented. *Greater weight will not be granted to the types of evidence included on the list than to the types of evidence not listed.*" 29 C.F.R. § 1630, app. § 1630.2(n) (emphasis added). As in any case, testimony from the plaintiff can be sufficient to preclude summary judgment, provided that it creates a genuine dispute of material fact.

Giving weight to Harris's testimony in this case will not mean that "every failure-to-accommodate claim involving essential functions would go to trial." Maj. Op. at 11. Take the issue of whether physical presence at the worksite is an essential function. Some jobs clearly require an employee to be in the office—for example, an employee who works in a factory and must use large immobile equipment that is located only on-site. Testimony from that employee that he or she could nevertheless work from home on that immobile equipment will not create a genuine dispute of material fact precluding summary judgment.

What appears to be driving the majority's unwillingness to give any weight to Harris's own testimony is an unstated belief that employee testimony is somehow inherently less credible than testimony from an employer. Employers, just as much as employees, can give testimony about whether a particular function is essential that is "self-serving" or not grounded in reality. Our role is not to assess who is more credible. Rather, at the summary-judgment stage, we must take the evidence in the light most favorable to the nonmovant. As we recently explained, "[i]f an employer's judgment about what qualifies as an essential task were conclusive, an employer that did not wish to be *inconvenienced* by making a reasonable accommodation could, simply by asserting that the function is essential, avoid the clear congressional mandate that employers mak[e] reasonable accommodations." *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) (internal quotation marks omitted) (second alteration in original).

## 2. Telework agreements of other resale buyers

The EEOC did not present just Harris's own declaration. The EEOC also argued that the fact that Ford allowed other resale buyers to telecommute helped to create a genuine dispute of

material fact. Yes, other resale buyers did not telework in exactly the same manner that Harris initially proposed. They had been approved to telecommute on one to two set days per week. R. 66-21 (Telecommuting Agreements) (Page ID #1361–63); R. 60-22 (Telecommuting Agreement) (Page ID #1173); R. 66-20 (Ford Resp. to Interrogs. at 2–3) (Page ID #1359–60) ("Ford . . . has identified the following GSR buyers within the department where Ms. Harris worked . . . who participated in telecommuting arrangements in 2009: . . . Joan Mansucti (*2 days per week in agreement* but telecommuted 1 day per week)." (emphasis added)). Karen Jirik from HR characterized the telework agreements of other resale buyers as including a requirement that "an employee with an approved telecommuting arrangement should be prepared to come into the office on telecommute days when the business or management requires it." R. 60-4 (Jirik Decl. ¶ 7) (Page ID #1048).

The gulf between Harris's request and the telecommuting arrangements of other resale buyers, however, is not so wide or clear as the majority claims it is. The majority's unsupported assertion to the contrary, there is no evidence in the record that Ford ever explicitly offered Harris a similar teleworking agreement—a set schedule of days plus a commitment to come into the office if necessary. R. 66-10 (Mtg. Notes) (Page ID #1318–24). Gordon did describe the telework agreements of the resale buyers as an example of "under what circumstances he felt telecommuting would work for" a resale buyer. *Id.* at 6 (Page ID #1323). However, Gordon did so at the end of Ford's second meeting with Harris. *Id.* Ford opened that meeting by telling Harris that her telework request had been denied, so it is hard to see how Gordon's discussion could in any way be construed as an offer for Harris to telecommute in a similar fashion. *Id.* at 4 (Page ID #1321). Although Jirik claimed that the other resale buyers had agreed to come into the office if necessary, that requirement does not appear in Ford's telecommuting policy or in the telecommuting agreements of other resale buyers. R. 60-11 (Telecommuting Policy) (Page ID #1102–16); R. 66-21 (Telecommuting Agreements) (Page ID #1361–63); R. 60-22 (Telecommuting Agreement) (Page ID #1173). Even if actually enforced, there is no record evidence indicating that Harris would not have also agreed to come into the office if a work matter required it. And again, Harris did *not* request to telework four days per week, every week.

Even accepting the differences from Harris's initial request, the telecommuting arrangements of other resale buyers undercut Ford's claim that, at any given moment, resale buyers must engage in spur of the moment, face-to-face trouble-shooting in order to perform their jobs effectively. By definition, unexpected problems might arise when a resale buyer is telecommuting, and he or she therefore could not participate in face-to-face, spur-of-the-moment meetings to address those problems. Yet Ford still determined that those resale buyers could effectively perform the teamwork functions of their jobs while being absent from the office one to two days per week. The potential difference in predictability in when Harris would be in the office more clearly implicates scheduled teamwork, like meetings. Again, however, Harris attested that "*all* internal meetings included the conference call attendance option." R. 66-3 (Harris Decl. ¶¶ 7, 9) (Page ID #1263) (emphasis added).

### 3. Ford's own judgment

Ford's own judgment that physical presence in the office is an essential function of Harris's job certainly is entitled to consideration, but that judgment is not dispositive. In defining "[q]ualified individual," the ADA states only that "*consideration* shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8) (emphasis added). Noticeably absent is the word "deference." *See Rorrer*, 743 F.3d at 1042. The EEOC regulations interpreting this section similarly include the employer's judgment *as just one of seven factors* courts should consider. 29 C.F.R. § 1630.2(n)(3). Yes, the EEOC regulations provide that "inquiry into the essential functions is not intended to second guess an employer's business judgment with regard to production standards," but they also state that "whether a particular function is essential 'is a factual determination that must be made on a case by case basis [based upon] *all* relevant evidence.'" *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998) (quoting 29 C.F.R. § 1630, app. § 1630.2(n)) (alterations in original). Other circuits also treat the employer's judgment as just one factor to consider in assessing whether a particular function is essential. *See, e.g.*, *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 279 n.22 (4th Cir. 2004); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002); *Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001).

The majority's test for when an employer's judgment that a function is essential can be overcome—if it is not "job-related, uniformly-enforced, [or] consistent with business necessity," Maj. Op. at 13—is thus not compelled by the ADA or the EEOC regulations. And in fact, the majority's test is in direct tension with the regulations' insistence that the inquiry is a fact-intensive, case-by-case determination.

Moreover, the majority's insistence that the "general rule" is that physical attendance at the worksite is an essential function of most jobs does not advance the analysis in this case. In many of the cases cited by Ford for this proposition, the courts actually held that *regular* attendance is an essential function, while assuming (without deciding) that that regular attendance must be at the physical worksite. *See, e.g.*, *Vandenbroek v. PSEG Power CT LLC*, 356 F. App'x 457, 460 (2d Cir. 2009); *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998). When courts have addressed the issue, the record had, in fact, established that the employee had to be physically present to access equipment or materials located only in the office, or to provide direct services to clients or customers. *See, e.g.*, *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1238–39 (9th Cir. 2012) (neo-natal nurse who provided direct patient care); *E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (forklift operator); *Hypes v. First Commerce Corp.*, 134 F.3d 721, 726 (5th Cir. 1998) (loan review analyst who used confidential documents that could not leave the office); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (teacher).

Here, in contrast, the sole reason given by Ford for why Harris needs to be physically present in the workplace is that the resale buyer position requires a high degree of face-to-face teamwork. Ford does not claim that necessary physical equipment or files can be accessed only on-site, or that Harris must interact with outside clients at Ford's work-site.

Nor do cases noting teamwork as one reason for finding physical presence an essential job function resolve this case. Of the cases cited by Ford, all but two involved jobs that otherwise obviously require physical attendance—materials located only in the office or direct client interaction. The courts therefore did not need to consider squarely whether teamwork might be effectively accomplished remotely because other aspects of the employees' jobs clearly

required them to be physically present at work. *See, e.g.*, *Samper*, 675 F.3d at 1238 (neo-natal nurse who provided direct patient care); *Hypes*, 134 F.3d at 726 (loan review analyst who used confidential documents that could not leave the office). And in one of the two remaining cases, the employee did not actually contest that her teamwork responsibilities could be performed only on-site; rather, she argued that another employee could take up the in-person teamwork duties of her job. *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1120–21 (10th Cir. 2004) (noting that the employee testified that "one of the other fourteen service coordinators in her group can perform the 'teaming' duties, such as covering for a co-employee on break").

Therefore, only the Seventh Circuit's decision in *Vande Zande v. Wisconsin Department of Administration*, 44 F.3d 538 (7th Cir. 1995), arguably presents a set of facts similar to the present case. In *Vande Zande*, the plaintiff had a job that did not require her to use materials present only in the workplace or to interact directly with clients on-site.[3] The *Vande Zande* court specifically stated that its conclusion that "team work under supervision generally cannot be performed at home" would "no doubt change as communications technology advances." *Id.* at 544. Technology has undoubtedly advanced since 1995 in facilitating teamwork through fast and effective electronic communication such that it should no longer be assumed that teamwork must be done in-person.

Thus, neither the general case law on physical presence at the work-site nor prior case law on teamwork resolves this case. Ford gave only one reason for why Harris's physical presence at the worksite is an essential function of her job—that the resale buyer position requires a great deal of face-to-face teamwork. The EEOC presented two pieces of evidence that directly contradict this claim. Summary judgment is therefore not appropriate.

Finally, the majority's claim that failure to grant summary judgment to Ford would turn telework into a "weapon" completely overstates the reach of this case and itself sets a problematic precedent for other failure-to-accommodate cases. First, providing telework is not just a good deed; sometimes it is legally required under the ADA. Second, in any given case, employees seeking telework as a reasonable accommodation partly on the basis that other

---

[3]The court in *Vande Zande* only briefly described the plaintiff's job as "that of a program assistant, and involved preparing public information materials, planning meetings, interpreting regulations, typing, mailing, filing, and copying." 44 F.3d at 544.

employees are permitted to telework would need to show that those other employees have similar job duties to their own. They cannot point to just any employee. Here, Harris pointed to telework agreements of other resale buyers. More fundamentally, in assessing whether a function is essential, the EEOC regulations expressly invite courts to consider the experience of other employees "in similar jobs." 29 C.F.R. § 1630.2(n)(3)(vii). Indeed, the majority's test for whether a function is essential also requires assessing how the employer treats other employees. Thus, this kind of comparison is inevitable in order to evaluate properly many reasonable-accommodation claims. The majority would privilege Ford's overstated perverse-incentives argument at the expense of properly and carefully assessing reasonable-accommodation claims as the ADA and the EEOC regulations require. Finally, I doubt that Ford and other employers would actually limit telework so drastically based on the slight risk that in certain reasonable-accommodation cases, the telework agreements of employees with similar job duties might be relevant. The majority ignores the myriad other reasons why employers might choose to provide telework to their employees, such as incentivizing individuals to come work for them or reducing the size of the physical workplace.

**C.      The EEOC created a genuine dispute of material fact whether telework is a reasonable accommodation for Harris.**

Alternatively, there is a genuine dispute of material fact whether Harris was qualified with the reasonable accommodation of telework. Many of Ford's arguments that telework would not be a reasonable accommodation for Harris confuse flex-time arrangements—when an employee might work after regular business hours or on the weekends—with telework during core business hours only—when Ford's offices are open. Harris's request can be construed as a request to telework during core business hours only.[4] If Harris teleworked during core business hours only, Ford's concerns that she could not access pricing information from other Ford employees or be available to interact with team members would not arise.

---

[4]Harris's request for telework did not specify whether it was for flex-time or during core business hours, stating only that "[p]er my disability and Ford's Telecommuting policy, I am asking Ford to Accommodate my disability by allowing me to work up to four days per week from home." R. 60-10 (Page ID #1100). The definition of telecommuting in Ford's policy is "a voluntary agreement between an employee and local management whereby the employee performs a portion of their *normally scheduled work* from an agreed upon alternate work site." R. 60-11 (Telecommuting Policy at 2) (Page ID #1103) (emphasis added). Thus, Harris's request could be read as a request to telework during normally scheduled work hours only. Taking the facts in the light most favorable to Harris, Harris's request should be construed as a request to telework during core business hours only.

That Harris had attendance issues does not make her request to telework unreasonable. Harris missed work because of her disability. As the Ninth Circuit has held, "[i]t would be inconsistent with the purposes of the ADA to permit an employer to deny an otherwise reasonable accommodation because of past disciplinary action taken due to the disability sought to be accommodated." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001). Moreover, Ford did not meet its burden to show that allowing Harris to telework would be an undue hardship.

Harris's prior experiments with telework do not compel the conclusion that the telework arrangement she requested in this case was unreasonable. The majority again refuses to take the posture that summary judgment requires, and instead reads factual disputes or ambiguity in the record in the light least favorable to Harris. Harris's prior experience with telecommuting under Gordon—to the extent the informal, sporadic arrangement can even be considered a full "experiment"—involved teleworking during non-core business hours only. R. 60-2 (Gordon Decl. ¶ 8) (Page ID #1029–30). It is not clear from the record whether Harris's two prior experiences with telecommuting under her supervisor Dawn Gontko were flex-time telework arrangements, or telework during core business hours. R. 60-3 (Gontko Decl. ¶ 3) (Page ID #1043) (stating that she "agree[d] to permit [Harris] two trial Alternative Work Schedule ('AWS')/telecommute periods" and defining AWS as "a Ford program where employees, with supervisor approval, are permitted to work four 10 hour days per week," without specifying whether or what portion of those days are during core business hours). If flex-time, the fact that Harris was unable "to establish regular and consistent work hours," as Gontko stated, does not necessarily mean that Harris would not consistently work in the set timeframe of core business hours if she were not given flexibility in her work hours. *Id.* ¶ 3 (Page ID #1043). The uncertainty about the nature of Harris's two prior telework experiences also makes it difficult to evaluate Gontko's statement that Harris failed "to perform the core objectives of the job." R. 60-7 (Gontko Dep. at 20) (Page ID #1089). If Harris were allowed to telework only outside of core business hours, as occurred with Gordon, she may not have been able to access information necessary to perform her job or to reach co-workers. Similar problems would not arise if she had been permitted to telework during core business hours. The key point is that the current record does not resolve these ambiguities. At the summary-judgment stage, we are required to read the

facts in the light most favorable to Harris. Here, that would mean assuming such prior telework experiments were not during core business hours. The majority, yet again, assumes the opposite.

**D.      The EEOC created a genuine dispute of material fact whether Ford failed to engage sufficiently in the interactive process to clarify Harris's telecommuting request.**

There is a genuine dispute of material fact whether Ford sufficiently engaged in the interactive process to clarify Harris's telecommuting request. The majority places an unreasonable and likely unachievable burden on employees to propose the perfect accommodation from the start of the process. That burden is directly at odds with the EEOC regulations' insistence that *both* the employee and the employer have an obligation to participate in the interactive process and, through that participation, to develop and clarify whether a reasonable accommodation is possible. Ford did not seriously try to clarify Harris's initial teleworking request, and instead focused on building a case for why she could not telework.

The ADA's regulations state that, "[t]o determine the appropriate reasonable accommodation [for an employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(*o*)(3). We, along with many other circuits, have held that the employer's duty to participate in the interactive process in good faith is mandatory. *See, e.g.*, *Kleiber*, 485 F.3d at 871 (citing cases). If there is a genuine dispute of material fact whether the employer sufficiently engaged in the interactive process, summary judgment for the employer should be denied. *See, e.g.*, *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 27 (1st Cir. 2001); *Rehling v. City of Chi.*, 207 F.3d 1009, 1016 (7th Cir. 2000); *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 954 (8th Cir. 1999).

Although the employee must trigger the interactive process by requesting a reasonable accommodation, an employee's initial request does not need to identify the perfect accommodation from the start, as the majority seemingly requires. 29 C.F.R. § 1630, app. § 1630.9 ("In general, . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."). Such a requirement would render the employer's duty to engage in the interactive process to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations" meaningless. 29 C.F.R. § 1630.2(*o*)(3); *see also Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296,

316 (3d Cir. 1999) ("The ADA's regulations make clear that the purpose of the interactive process is to determine the appropriate accommodations . . . . Therefore, it would make little sense to insist that the employee must have arrived at the end product of the interactive process before the employer has a duty to participate in that process."); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("The employer has at least some responsibility in determining the necessary accommodation.").

Because the interactive process is not an end in and of itself, the employee must present evidence that a reasonable accommodation could have been identified if the employer had engaged sufficiently in the interactive process. *See, e.g., Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) (holding that summary judgment was not warranted on whether the employer adequately engaged in the interactive process because the employee "met his burden to show that a reasonable accommodation was possible"). But that reasonable accommodation does not need to be the employee's initial request.

Here, Harris met her initial burden to trigger the interactive process by initially requesting telework up to four days a week. For the reasons explained above, there is a genuine dispute of material fact whether her initial request was itself a reasonable accommodation. Even if not, however, the EEOC has identified a reasonable accommodation that Harris testified she would have accepted if Ford had engaged in the interactive process: telework on one to two specified days per week, with the requirement that she take sick leave if her IBS flared up on a different day.[5] Appellant Supp. Br. at 1. It is an accommodation that largely parallels the telework agreements other resale buyers had with Ford, and thus Ford cannot credibly claim that this proposal would be an unreasonable accommodation or that the arrangement would make it impossible for Harris to perform the essential functions of her job. The majority ignores this additional accommodation identified by the EEOC that would have rendered Harris a qualified individual. Maj. Op. at 14.

---

[5]Ford is correct that Harris did not specifically attest that she would have accepted one to two days of telework on prescheduled days. But neither did she attest that she would not have accepted such an arrangement. R. 66-3 (Harris Decl. ¶ 17) (Page ID #1264) ("If Ford had offered to let me telecommute 1-2 days per week, that would have been acceptable.").

A reasonable jury could find that Ford did not in good faith seek to clarify Harris's telework request or explore whether some telework arrangement was feasible. The Seventh Circuit has articulated a case-by-case approach to determining which party is most responsible for the breakdown in the interactive process. As the court explained:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith *or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary*. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck*, 75 F.3d at 1135 (emphasis added).

Taking the facts in the light most favorable to Harris, Ford is more to blame for the breakdown of the interactive process than Harris. It is true that Ford met with Harris to discuss her request and proposed alternative accommodations, factors that courts have identified as indicators of "good faith" participation. *See Taylor*, 184 F.3d at 317. However, the EEOC persuasively argued that a reasonable jury could find that the alternatives Ford suggested were not *reasonable* accommodations because they did not address the problems Harris identified. Harris still might soil herself even in the shorter time it would take her to get to the restroom from a closer work cubicle. Moreover, it is unreasonable to respond that Harris could wear Depends or clean herself up after any accidents. Harris should not have to suffer the embarrassment of regularly soiling herself in front of her coworkers. Ford's other alternative— to help Harris find a different position within Ford, R. 60-4 (Jirik Decl. ¶ 9) (Page ID #1049)— was not a reasonable accommodation because Ford did not guarantee that such a position existed. Further, we have previously held that reassignment is reasonable only when the employer demonstrates that it would be an undue hardship to accommodate the employee in his or her current position. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). Thus, Ford did not propose reasonable alternative accommodations, so those offers do not conclusively establish its good-faith participation in the interactive process. *Cf. Beck*, 75 F.3d at 1136 (holding that an employer sufficiently participated in the interactive process in part because the

employee "offer[ed] no evidence that" the alternative accommodation proposed by her employer "was an unreasonable accommodation").

The real issue is that Ford chose to interpret Harris's request to telework as a final offer, rather than as an opening bid.  Of critical importance, the notes Ford submitted from its April 6, 2009, meeting with Harris to discuss telework indicate that Ford understood that Harris was not necessarily requesting to telework four days per week.  R. 66-10 (Meeting Notes at 3) (Page ID #1320).  Gordon likewise indicated in his declaration that he understood Harris's request was for "*up to* four days per week" of telework, not necessarily four days per week, every week.  R. 60-2 (Gordon Decl. ¶ 11) (Page ID #1033–34) (emphasis added).  Nevertheless, Ford did not explore more limited telework options with her.  Rather, Ford effectively shut down all discussion of telework options after the April 15, 2009, meeting when Gordon told Harris that "her job could not be performed with a telecommuting arrangement" that allowed "Harris . . . to telecommute an unpredictable '*up to* four days per week.'"  R. 60-2 (Gordon Decl. ¶ 12) (Page ID #1034) (emphasis added).  And Harris did not fail to provide critical information about her condition that would have enabled Ford to help clarify her request for telework, a circumstance that some courts have pointed to in placing more blame on the employee for the breakdown of the interactive process.  *Cf. Beck*, 75 F.3d at 1137.

Ford cannot escape the consequences of its insufficient participation by pointing to the fact that Harris did not re-approach Ford after the April 15 meeting to discuss other accommodations, or that it proposed counteroffers even though it may not have been legally required to do so.  If Ford had seriously attempted to clarify Harris's initial request, or offered indisputably reasonable alternative accommodations, the fact that Harris did not re-approach Ford might make her the more blameworthy party.  But Ford never sufficiently engaged with Harris's initial request.  She did not need to make another request because her original request was never sufficiently considered or explored *in the first place*.  Even if Ford had sufficiently considered Harris's initial request, that does not end the matter.  The EEOC Enforcement Guidance notes that "[t]he duty to provide reasonable accommodation is an ongoing one."  EEOC Enforcement Guidance on Reasonable Accommodation ¶ 32, http://www.eeoc.gov/policy/docs/accommodation.html.  As the Ninth Circuit has explained with

reference to this guidance, "the employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation." *Humphrey*, 239 F.3d at 1138. After the first attempt to identify a reasonable accommodation failed, Ford made no effort to continue the process, despite knowing that Harris continued to suffer from IBS. In fact, Ford explicitly told Harris that she bore the sole burden to identify another accommodation, abdicating any responsibility on its part to help in that process. R. 66-10 (Mtg. Notes at 6) (Page ID #1323) ("[Karen Jirik] said that she . . . is willing to talk with [Harris] *again if she identifies another accommodation*." (emphasis added)). It is understandable that Harris might have concluded that further requests would have been fruitless after Ford conclusively told her that telework would not work and ignored her insistence that her initial request merely quoted Ford's own telecommuting policy.

In sum, Ford did not seriously pursue an accommodation with Harris that addressed the key challenge she identified—physical presence every day of the week at Ford's work site. Instead, Ford approached the discussion of telework from its first meeting with Harris by reading her request as expansively as possible and then narrowly focusing on why it would not work. Ford ignored Harris's insistence that she had merely quoted the language of the telework policy and that she was open to more limited telework arrangements. Ford proposed two alternatives that did not address the problems Harris faced with her IBS and were not reasonable accommodations. After shutting down all further discussion of telework, Ford did not make any attempt to pursue further discussions with Harris in the interactive process. This is far from sufficient participation, and thus summary judgment should be denied on this basis as well.

**E.      The EEOC created a genuine dispute of material fact whether Ford retaliated against Harris for filing a charge with the EEOC.**

Harris presented more than sufficient evidence to preclude summary judgment on her ADA retaliation claim. After Harris filed her charge with the EEOC, *three* potentially suspicious events occurred: for the first time, Ford changed Harris's performance rating to signify poor performance for problems that had been ongoing for years; Ford put Harris on a performance-enhancing plan ("PEP"), a plan that Harris testified in her deposition was in part designed for her to fail; and Harris's supervisor began holding intimidating meetings with Harris to discuss her performance problems. Ultimately, Ford fired Harris only four months after she filed her charge.

A reasonable jury could certainly infer from the timing and nature of these events that Ford fired Harris in retaliation for the charge she filed with the EEOC.

More specifically, first, the EEOC met its burden to establish a prima facie case of retaliation—that retaliation was the but-for cause of Harris's termination—by pointing to two pieces of evidence: (1) the temporal proximity between Harris filing a charge with the EEOC and her termination; and (2) that the problems Ford identified with Harris's performance existed before and after she filed her charge with the EEOC, but prompted an overall negative performance review only after she filed her charge. R. 60-13 (2008 Performance Review) (Page ID #1123–29); R. 60-12 (2007 Performance Review) (Page ID #1117–22); R. 60-14 (2006 Performance Review) (Page ID #1130–35); R. 60-16 (2009 Interim Review) (Page ID #1140–42). It is true that Ford moved to a new rating system in 2009, but it does not follow that Ford could have given Harris a low rating only under the new system. Ford could have ranked Harris as lower than "exceptional plus" under the old rating system, but chose not to do so. Even if "exceptional plus" were the default rating under the former system as Ford now claims, and attained by 80% of employees, Ford still chose to give Harris that rating in 2008 despite the fact that Ford argues she ranked in the bottom 10% of her peers in more detailed reviews. R. 60-2 (Gordon Decl. ¶ 13) (Page ID #1035). The point is that only after Harris filed her charge with the EEOC did Ford decide to change her overall performance rating to signify poor performance for problems that had been ongoing for several years.

Under *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), Harris does not need to prove that Ford would never have fired her, even at some later point, had she not filed her EEOC complaint. Her burden is to present evidence suggesting that Ford would not have fired her *at the time it did* if she had not filed her EEOC complaint. The Supreme Court recently provided an example of but-for causation that helps illustrate this point:

> [W]here A shoots B, who is hit and dies, we can say that A [actually] caused B's death, since but for A's conduct B would not have died. The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back. *Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived.*

*Burrage v. United States*, 134 S. Ct. 881, 888 (2014) (emphasis added) (internal quotation marks and citation omitted). Like the man with multiple diseases in the second example, Harris eventually might have been fired because of her performance problems. The key question is whether the EEOC charge she filed was the poison that precipitated that firing to occur at the particular time it did. *See also Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) ("[I]n retaliation cases, courts must determine 'what made [the employer] fire [the employee] *when it did.*'" (quoting *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009)) (emphasis in original)).

Policy considerations also weigh against the majority's crabbed reading of *Nassar*. Under the majority's test, it would be impossible for employees with performance problems to bring a retaliation claim based on a theory that those performance problems did not truly motivate the employer to fire them. That cannot accord with the purposes of the ADA because employees with disabilities often will have performance problems precisely because of the struggles they encounter to manage those disabilities.

Second, the EEOC presented sufficient evidence to create a genuine dispute of material fact that Ford's asserted reasons for firing Harris did not actually motivate Ford to fire her. Ford claimed it fired Harris because she failed to achieve the objectives of the PEP and because of her attendance problems. In addition to the two factors discussed above (i.e., the timing of the termination and the change in Harris's overall performance rating), the EEOC pointed to two other pieces of evidence that suggest Ford was not actually motivated to fire Harris for the reasons it gave: (1) the design of the PEP; and (2) meetings Gordon held with Harris that she perceived as intimidating.

**1. Design of the PEP**

One of the PEP's objectives was that Harris eliminate a backlog of paperwork. Harris testified in her deposition that the paperwork was pending only because she needed to wait for responses from suppliers and coworkers, not because she was slacking. R. 60-6 (Harris Dep. at 264) (Page ID #1077). Thus, a reasonable jury could infer that the PEP was designed so that Harris would fail.

Harris's testimony on why she thought the plan was designed for her to fail is not "blatantly contradicted by the record," as the majority claims. Maj. Op. at 18. First, that Harris may have failed two prior performance plans does not objectively establish that the PEP was not designed for her to fail. The majority does not claim that those prior performance plans were exactly the same as the plan given Harris after she filed her discrimination charge. Nor could it, based on the current record. Second, the majority cites nothing in the record that supports its additional assertion that Ford used "similar" PEPs for other poorly performing employees or that those PEPs were similar with respect to the critical objective for this case, that Harris eliminate a backlog of paperwork. Maj. Op. at 19.

## 2. Meetings with Gordon

After Harris filed her charge with the EEOC, Harris's supervisor Gordon began holding one-on-one, closed-door meetings with Harris that Harris perceived as intimidating. R. 60-6 (Harris Dep. at 218–24) (Page ID #1066–67). A reasonable jury could certainly doubt that these meetings were meant to help Harris, and instead could decide that they were designed to hurt her. Harris recounted meetings that were not normal, professional interactions between a supervisor and employee discussing that employee's performance. Rather, Harris testified that Gordon yelled at her repeatedly, threatened her, and even held one meeting on her attendance problems with all of her co-workers present. For example, Harris testified in her deposition that in one meeting Gordon "yell[ed]" at her "military style," asking her "did [she] agree he was a good manager? He was a good manager, did [she] agree?" *Id.* at 219 (Page ID #1066). In that same meeting, Harris testified that Gordon threatened her with an insubordination charge when she asked to leave to address an urgent work matter. *Id.* Gordon also held a meeting with all of Harris's co-workers to discuss Harris's attendance problems. R. 60-2 (Gordon Decl. ¶ 19) (Page ID #1038). At the meeting, Gordon discussed, in explicit terms, the nature of Harris's illness, which she had previously kept private. R. 41-3 (Harris Dep. at 329) (Page ID #627). Harris found that meeting so upsetting that she eventually left the room in tears and had a panic attack. *Id.* at 326–29 (Page ID #627). Thus, Harris did not just express "'subjective skepticism regarding the truth of' whether Gordon was actually trying to help her." Maj. Op. at 17 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004)). She made factual

allegations about the unprofessional ways in which Gordon conducted those meetings—yelling at her, threatening her, etc.—from which a reasonable juror could conclude that Gordon held those meetings to retaliate against Harris for filing her charge with the EEOC.[6]

There is also a genuine dispute of material fact concerning whether Lisa King was the sole decisionmaker in Harris's termination. Ford and the majority assert that King made the decision to fire Harris by herself and that Gordon was on vacation at the time. R. 60-2 (Gordon Decl. ¶ 26) (Page ID #1041); R. 60-4 (Jirik Decl. ¶ 17) (Page ID #1053); R. 60-15 (Kane Decl. ¶ 8) (Page ID #1138). King supervised Mike Kane, who in turn supervised Gordon. R. 66-23 (King Dep. at 26) (Page ID #1368). King's deposition testimony about the termination decision, however, portrays the decision as a group decision, involving everyone in Harris's supervisory chain, including Gordon, and people from HR. When asked about her role in Harris's termination decision, King responded:

> My role was one of understanding the actions that we were taking, being responsible with the team for consensing [sic] that we were comfortable that we were taking actions, and the team in question would have been the varied levels of supervision in the chain and the HR organization. *So when we were making decisions, those were consensed* [sic] *decisions. I would be a participant within those discussions.* And then I was also responsible for oversight of the actions that we were taking to ensure that they were fair and reasonable, that we were acting within policy, those types of things.

R. 66-23 (King Dep. at 27) (Page ID #1368) (emphasis added). In response to the question "[W]ho do you recall being part of the team that you just testified . . . [was] involved in the termination of Jane Harris?" King responded, "So the folks that would be involved are the three I said operationally,"—"John Gordon, Mike Kane, and myself"—"That was her supervisory chain. And then within HR, Karen Jirik would have been involved, at certain points Leslie Pray, and at certain points Stephanie Covington." *Id.* at 27–28 (Page ID #1368). King also characterized the decision to fire Harris as having been reached over several meetings. R. 60-5 (King Dep. at 67) (Page ID #1058). Thus, a reasonable jury could conclude that Gordon was actually involved in

[6]The majority's citation to *Keever v. City of Middletown*, 145 F.3d 809 (6th Cir. 1998), is inapposite. The plaintiff-employee in that case (Keever) did not allege that the "[c]onversations between [him] and his superiors about his performance" were conducted in any unprofessional way, as Harris alleges here. *Id.* at 813. Moreover, the passage quoted by the majority addressed whether the meetings described by Keever were sufficiently severe to create a hostile work environment, not whether those meetings might be evidence of pretext. *Id.*

the decision to fire Harris. Gordon's potentially retaliatory conduct can therefore certainly help establish pretext.

Even if King were the sole decisionmaker, there is a genuine dispute of fact whether Gordon's potentially retaliatory conduct is sufficient to establish "cat's paw" liability. In the context of retaliation claims, "cat's paw liability will lie . . . if (1) non-decisionmakers took actions intended" to cause the adverse employment action against the employee "in retaliation for his protected conduct, and (2) those retaliatory actions were a but-for cause of" the adverse employment action. *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 428 (6th Cir. 2014).

As to the first element, a reasonable jury could infer that the meetings Gordon held with Harris about her performance demonstrated a retaliatory animus towards her. Gordon was responsible for writing Harris's performance evaluations, and he also designed the PEP along with his supervisor Mike Kane. R. 60-2 (Gordon Decl. ¶ 13, 20) (Page ID #1034–35, 1039). A reasonable jury could therefore conclude that Gordon's retaliatory animus towards Harris infected his assessment of Harris's performance and the design of the PEP. Moreover, Gordon made the assessment that Harris had not met many of the PEP objectives. *Id.* ¶¶ 21–25 (Page ID #1039–40); R. 60-18 (PEP) (Page ID #1144–50). As for intent, Gordon wrote on Harris's 2009 Interim Performance Review that "[i]f significant improvement is not noted during [the 30-day PEP] time period . . . , Ms. Harris' employment with Ford Motor Company may be terminated." R. 60-16 (2009 Interim Review at 2) (Page ID #1141). Given that Gordon knew the consequences of failing to achieve the PEP objectives, a reasonable jury could infer that, because Gordon found that Harris failed, he intended to cause Harris to be fired.

Whether King made a sufficiently independent investigation into Harris's performance such that Gordon's actions were not the but-for cause of Harris's termination is in dispute. *Staub v. Proctor Hosp.*, 562 U.S. 411, __, 131 S. Ct. 1186, 1193 (2011) ("[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . , then the employer will not be liable."). King's deposition does not explain whether she performed an independent assessment of Harris's progress in achieving the PEP objectives or of Harris's performance generally. R. 60-5 (King Dep.) (Page ID #1054–58). Notably, she does not say that she would have fired Harris for her absences alone, a factor independent of Gordon's

influence. *Id.* Other supervisors characterized the decision that Harris had not met the PEP objectives as a group effort, with King making the final decision, but it is not clear to what extent King's decision was independent of Gordon's assessment. *See, e.g.*, R. 60-4 (Jirik Decl. ¶ 17) (Page ID #1053) ("At the conclusion of the 30 days, it is my understanding that Ms. Harris' management team (i.e., Lisa King, Mike Kane and John Gordon) determined that she had not met many of the PEP objectives."). Thus, there is a genuine dispute of material fact whether Gordon's actions could establish cat's paw liability.

Even if not sufficient to create a genuine dispute of material fact on cat's paw liability, Gordon's actions are relevant circumstantial evidence of pretext. As we have explained:

> Although discriminatory statements by a nondecisionmaker, standing alone, generally do not support an inference of discrimination, the comments of a nondecisionmaker are not categorically excludable. Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff. While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add "color" to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998) (internal quotation marks and citations omitted). This reasoning applies with equal force to retaliatory conduct. Several factors that we have found to increase the probative value of such statements or conduct are present here: Gordon is a supervisor in Ford's hierarchy, not a co-worker; Gordon's meetings were held close in time to the termination decision; and his actions "buttress[] other evidence of pretext." *Id.* at 357 (discussing these factors). Moreover, Gordon was involved in most of the meetings about Harris's poor performance before the actual termination decision, "a factor the *Ercegovich* Court found indicative of the intermediate employee's influence over the employment decisions." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 353 (6th Cir. 2012).

## II. CONCLUSION

The majority fails to engage in the fact-intensive, case-by-case determination required by the ADA and by EEOC regulations interpreting the ADA to assess Harris's claims. The majority consistently refuses to take the posture that summary judgment requires. Instead, it takes the

facts in the light *least* favorable to Harris or determines for itself that Harris's testimony is not credible. When the EEOC regulations and the standards of summary judgment are faithfully applied, clearly the EEOC has presented sufficient evidence to create a genuine dispute of material fact concerning whether Harris is a qualified individual, either because physical presence is not an essential function of her job or because telework is a reasonable accommodation for her, and regarding whether Ford retaliated against Harris for filing a charge with the EEOC. I therefore dissent, and would **REVERSE** the district court and **REMAND** for proceedings consistent with this opinion.